

1  DANIEL G. BOGDEN
   United States Attorney
2  DANIEL J. COWHIG
   KILBY C. MACFADDEN
3  Assistant United States Attorneys
   United States Attorney's Office
   501 Las Vegas Boulevard South, Suite 1100
4  Las Vegas, Nevada 89101
   (702) 388-6336 / Fax: (702) 388- 6020

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
-oOo-

UNITED STATES OF AMERICA,               )   Case No.: 2:17-cr- 00078-KJD-PAL
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )   **PLEA AGREEMENT UNDER**
                                        )   **FED. R. CRIM. P. 11 (c)(1)(A) and (B)**
ROBERT CAPUTO,                          )
                                        )
            Defendant.                  )
_____)

The United States of America, by and through Daniel G. Bogden, United States Attorney,

and Daniel J. Cowhig and Kilby C. Macfadden, Assistant United States Attorneys, the defendant

ROBERT CAPUTO, and his attorney, Frank H. Cofer III, submit this Plea Agreement under Federal

Rules of Criminal Procedure 11(c)(1)(A) and (B).

## I.    SCOPE OF AGREEMENT

The parties to this Plea Agreement are the United States of America and the defendant

ROBERT CAPUTO.  This Plea Agreement binds the defendant and the United States Attorneys'

Office for the District of Nevada.  It does not bind any other prosecuting, administrative, or

regulatory authority, the United States Probation Office, or the Court.

The Plea Agreement sets forth the parties' agreement regarding the criminal charges

referenced in the Plea Agreement and the applicable sentence, fine, forfeiture, and restitution.  It

1    does not control or prohibit the United States or any agency or third party from seeking any other

2    civil or administrative remedies directly or indirectly against the defendant.

3    **II.    DISPOSITION OF CHARGES AND WAIVER OF TRIAL RIGHTS**

4         A.    <u>Guilty Plea</u>.  The defendant knowingly and voluntarily agrees to plead guilty to the

5    following charge as set forth in the Criminal Information:

6              <u>Count 1</u>:  Conspiracy to Commit Mail Fraud and Wire Fraud, in violation of 18

7    U.S.C. § 1349

8              The defendant also agrees to the imposition of the in personam criminal forfeiture

9    money judgment as set forth in this Plea Agreement and the Forfeiture Allegations of the Criminal

10   Information.

11        B.    <u>Waiver of Trial Rights</u>.  The defendant acknowledges that he has been advised and

12   understands that by entering a plea of guilty he is waiving -- that is, giving up -- certain rights

13   guaranteed to all defendants by the laws and the Constitution of the United States.  Specifically, the

14   defendant is giving up:

15             1.    The right to proceed to trial by jury on all charges, or to a trial by a judge if

16   the defendant and the United States both agree;

17             2.    The right to confront the witnesses against the defendant at such a trial, and to

18   cross-examine them;

19             3.    The right to remain silent at such a trial, with assurance that his silence could

20   not be used against him in any way;

21             4.    The right to testify in his own defense at such a trial if he so chooses;

22             5.    The right to compel witnesses to appear at such a trial and testify in the

23   defendant's behalf;

24

6.      The right to have the assistance of an attorney at all stages of such

proceedings; and

7.      The right to be indicted by a Grand Jury.

C.      <u>Withdrawal of Guilty Plea</u>.  The defendant will not seek to withdraw his guilty plea

after he has entered them in court.

D.      <u>Additional Charges</u>.  The United States agrees not to bring any additional charges

against the defendant arising out of the investigation in the District of Nevada that culminated in this

Plea Agreement and based on conduct known to the United States except that the United States

reserves the right to prosecute the defendant for any crime of violence as defined by 18 U.S.C. § 16.

## III.     ELEMENTS OF THE OFFENSES

A.      The elements of Conspiracy to Commit Mail Fraud and Wire Fraud, in violation of 18

U.S.C. § 1349, are:

1.      Beginning and ending on or about the dates specified, there was an agreement

between two or more persons to commit Mail Fraud, in violation of 18 U.S.C. § 1341, and Wire

Fraud, in violation 18 U.S.C. § 1343, and;

2.      The defendant became a member of the conspiracy knowing of at least one of

its objects and intending to help accomplish it.

*See* 9th Cir. Crim. Jury Instr. 8.20 (2010).

B.      The elements of Mail Fraud, in violation of 18 U.S.C. § 1341, are:

1.      The defendant knowingly participated in a scheme or plan to defraud, or a

scheme or plan for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises;

3

2.        The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3.        The defendant acted with the intent to defraud; that is, the intent to deceive or cheat, and;

4.        The defendant used, or caused to be used, the mails or private and commercial interstate carriers, according to the direction thereon, to carry out or attempt to carry out an essential part of the scheme.

*See* 9th Cir. Crim. Jury Instr. 8.121 (2010).

C.        The elements of Wire Fraud, in violation of 18 U.S.C. § 1343, are:

1.        The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

2.        The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3.        The defendant acted with the intent to defraud; that is, the intent to deceive or cheat, and;

4.        The defendant transmitted and caused to be transmitted by means of wire communications in interstate commerce documents and information to carry out or attempt to carry out an essential part of the scheme.

*See* 9th Cir. Crim. Jury Instr. 8.124 (2010).

///

///

## IV.   FACTS SUPPORTING GUILTY PLEA

A.    The defendant will plead guilty because he is, in fact and under the law, guilty of the crimes charged.

B.    The defendant acknowledges that if he elected to go to trial instead of pleading guilty, the United States could prove his guilt beyond a reasonable doubt.  The defendant further acknowledges that his admissions and declarations of fact set forth below satisfy every element of the charged offenses.

C.    The defendant waives any potential future claim that the facts he admitted in this Plea Agreement were insufficient to satisfy the elements of the charged offenses.

D.    The defendant admits and declares under penalty of perjury that the facts set forth below are true and correct:

<u>COUNT ONE</u>

1.    ROBERT CAPUTO and others joined and participated in a fraudulent telemarketing scheme that coconspirators devised to cheat people who owned timeshares out of money by promising to sell their timeshares in return for the owners paying a portion of the closing costs associated with the purported sales to the coconspirators.  Using this scheme, the conspirators defrauded more than 1,000 victims, many of them elderly, of more than $3,330,000 from October 2010 through April 2012.  In furtherance of the scheme, the coconspirators did the following:

2.    D.M.B., P.M.M, and others created a telemarketing company and registered it as Holiday Advertising in the State of Florida.  Under Florida law, a telemarketing company and each telemarketer working for that company have to be licensed through the Florida Department of Agriculture and Consumer Services (FDACS).  D.M.B., P.M.M. and

1    others caused coconspirators acting as telephone representatives to register with FDACS as

2    telemarketers working for Holiday Advertising.

3                  3.     D.M.B., P.M.M, and others caused the FDACS-approved Holiday

4    Advertising telemarketing script to be posted on the walls and in the cubicles as a cover in case

5    FDACS or other law enforcement agents conducted a compliance inspection, even though they

6    knew that the telemarketers would not and did not use the script and conducted no telemarketing

7    under the name of Holiday Advertising.

8                  4.     D.M.B., P.M.M., and others also caused Holiday Advertising to open bank

9    accounts and lease office space in Orlando, Florida

10                5.     D.M.B., P.M.M., and others caused conspirators to set up several

11    businesses in states other than Florida, including Nevada, to operate as front companies through

12    which the coconspirators operated and concealed the scheme from victims, consumer protection

13    agencies, and law enforcement agencies.   D.M.B., P.M.M., and others established the front

14    companies by buying inactive companies, known as shell companies, that had been registered for

15    at least 5 years.  D.M.B., P.M.M. and others used false identities to buy the shell companies, and

16    in some instances, registered the companies using false identities.

17               6.     After 90 days or so, D.M.B., P.M.M., and others caused conspirators to

18    change the names, mailing addresses, and physical locations of the front companies.  Those

19    businesses included Professional Concepts LLC, TeleTeton Corporation, Redline Funding LLC,

20    Great West Funding Incorporated, Equity Financial Services LLC, and First Capital Financial

21    Services Corporation in Nevada, among others.

22               7.     Using false identities, D.M.B., P.M.M., and others leased temporary office

23    space, also known as a virtual office, in different states to receive mail from the victims.

24

8.      D.M.B. and others caused coconspirators to pick up the checks and other materials the victims sent to the virtual offices, and either to deposit the checks or send the checks and other materials to the customer service section of the Holiday Advertising in Florida. By these means and others, D.M.B. and other leaders sought to prevent victims and law enforcement from learning that the scheme operated out of Orlando, Florida.

9.      D.M.B. and others caused coconspirators to set up and operate websites for each front company to make it appear that the front companies operated legitimately.  As part of the illusion of legitimacy, the websites included materially false and misleading information, such as the name of the front company, the address of the virtual office, images of the virtual office, fictitious profiles of the front companies' purported officers, and false customer testimonials, descriptions of the front companies, and press releases.

10.     P.M.M. and others used electronic devices to make it appear that telephones calls to or from the Holiday Advertising offices in Orlando, Florida, were placed to or from the front offices in the different states by associating the area codes of the front offices in different states with the Holiday Advertising offices in Orlando, Florida.

11.     D.M.B., P.M.M., and others caused the telemarketers calling victims to assume fictitious "telephone names" and to change their names each time the scheme used a different front company, in violation of Florida law that required telemarketers to use only the names under which they were licensed.

12.     D.M.B., P.M.M., and others knowingly and intentionally caused the coconspirators to make materially false and fraudulent pretenses, representations, and promises to the victims, including but not limited to: a) the name of the coconspirator making the call; b) the name of the company for which the coconspirator was working; c) the location from which the call was made; d) that a buyer had offered to purchase the victim's timeshare property; e) the

1   name and other identifying characteristics of the fictitious buyer; f) that upon advance payment

2   of reimbursable closing costs, the caller guaranteed the sale of the victim's timeshare property;

3   and g) that the sale would occur within 90 days of the victim's payment to the front company.

4          13.    D.M.B., P.M.M., and others also caused coconspirators to direct victims to

5   the websites for the front companies and if necessary to invite victims to "check out" the

6   "company offices" using Google Maps and Street View to enhance the material

7   misrepresentations about the front companies.

8          14.    Coconspirator B.N. and others acted as receptionists, and acting with the

9   intent to defraud, answered incoming calls to the main line as if they were answering for the

10   front companies, knowing that the name, location, address, area code, and the identities of the

11   fictitious officers of the front company they provided were false, along with other false and

12   fraudulent information.  The receptionists maintained a telephone list that cross-referenced the

13   conspirators telephone names with their true names and telephone extensions so the incoming

14   calls could be routed to the correct telemarketer.  The receptionists kept the exterior door to the

15   Holiday Advertising suites locked at all times to delay the entrance of FDACS or other law

16   enforcement, intending to give coconspirators time to conceal evidence of criminal activity.

17          15.    D.M.B. and others caused coconspirators K.N.M., B.S.L., L.L. (formerly

18   L.D.), and others, to operate a customer service section known as "KBL Services," a name

19   created from the first initial of the first name of the coconspirators then staffing the section.

20   There the coconspirators filled in fake contracts with the names of nonexistent buyers, emailed

21   the false contracts and instructions to victims directing them to send the contracts and money for

22   the closing costs to the front companies.  These coconspirators also received customer service

23   calls from victims, and told victims materially false and fraudulent information to lull the victims

24   into believing the promised sale would occur.

16.     In order to continue to mislead the victims and to prevent them from reporting the scheme to law enforcement for as long as possible after front companies were shut down, D.M.B. and others caused customer service telephone lines to be routed to answering machines that played messages identifying the abandoned front company, inviting the victims to leave messages, and promising to return "customer" calls as soon as possible.  That never happened.

17.     Each time a front company was switched to another, D.M.B., P.M.M., S.M.S., D.A.L. and others told coconspirators the front company had been shut down and gave them the name and location of the new front company, the address of the virtual office, the new telephone numbers, and other materially false information necessary to carry out the scheme. Coconspirators created new lists of telephone names for the receptionists, revised the fraudulent contracts, and fabricated new information to deceive the victims.

18.     With the knowledge of defendant CAPUTO, coconspirators changed the names, mailing and shipping addresses, and physical locations of the businesses to hide the scheme from consumer protection and law enforcement agencies.  The conspirators were instructed at the call rooms in Orlando, Florida, to hide the script, leads and paperwork of the fraudulent scheme in a private folder if anyone came in from the State to inspect their workspace in order to avoid detection.

19.     Defendant CAPUTO acted variously as a fronter and closer for Holiday Advertising.  He would use a script that would say the sale went through and that the customer needed to send their payment.  Customers were instructed to pay via mailing a check.  Caputo was directly responsible for more than $200,000 in losses to the victims.

20.     Defendant CAPUTO and the coconspirators, for the purpose of executing the scheme, used and caused to be used the United States Postal Service and commercial

interstate carriers to send and receive money and other items, and transmitted and caused to be transmitted by means of wire communications in interstate commerce communications, money, and documents.

21.     The defendant admits the in personam criminal forfeiture money judgment amount listed in Section X is (1) any property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1341 and 1343, specified unlawful activities as defined in Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1)(B), or Title 18, United States Code, Section 1349, conspiracy to commit such offenses and (2) any real or personal property constituting, derived from, or traceable to the gross proceeds obtained directly or indirectly as a result of violations of Title 18, United States Code, Sections 1341 and 1343, or of Title 18, United States Code, Section 1349, conspiracy to commit such offenses, and is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) with Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 982(a)(8)(B); and Title 21, United States Code, Section 853(p).

## V.     COLLATERAL USE OF FACTUAL ADMISSIONS

The facts set forth in Section IV of this Plea Agreement shall be admissible against the defendant under Federal Rule of Evidence 801(d)(2)(A) at sentencing for any purpose.  If the defendant does not plead guilty or withdraws his guilty plea, the facts set forth in Section IV of this Plea Agreement shall be admissible at any proceeding, including a trial, for impeaching or rebutting any evidence, argument or representation offered by or on the defendant's behalf.  The defendant expressly waives all rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 regarding the use of the facts set forth in Section IV of this Plea Agreement.

///

///

## VI.   APPLICATION OF SENTENCING GUIDELINES PROVISIONS

A.   <u>Discretionary Nature of Sentencing Guidelines</u>.  The defendant acknowledges that the Court must consider the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") in determining the defendant's sentence, but that the Sentencing Guidelines are advisory, not mandatory, and the Court has discretion to impose any reasonable sentence up to the maximum term of imprisonment permitted by statute.

B.   <u>Offense Level Calculations</u>.  The parties stipulate to the following calculation of the defendant's offense level under the Sentencing Guidelines, acknowledge that these stipulations do not bind the Court, and agree that they will not seek to apply any other specific offense characteristics, enhancements or reductions:

Count One, Conspiracy to Commit Mail Fraud and Wire Fraud

| | |
|---|---|
| Base Offense Level (USSG § 2B1.1(a)(1)) | 7 |
| Loss of More than $150K (USSG § 2B1.1(b)(1)(F)) | 10 |
| More than 10 victims (USSG § 2B1.1(b)(2)(A)) | 2 |
| Total Offense Level for Count One | 19 |
| Acceptance of Responsibility (USSG § 3E1.1(a)) | - 2 |
| Upon Motion of the Government (USSG § 3E1.1(b)) | - 1 |
| Total Offense Level | 16 |

C.   <u>Reduction of Offense Level for Acceptance of Responsibility</u>.  Under USSG §3E1.1(a), the United States will recommend that the defendant receive a two-level downward adjustment for acceptance of responsibility unless he (a) fails to truthfully admit facts establishing a factual basis for the guilty plea when he enters the plea; (b) fails to truthfully admit facts establishing the amount of restitution owed when he enters his guilty plea; (c) fails to truthfully admit facts

establishing the forfeiture allegations when he enters his guilty plea; (d) provides false or misleading information to the United States, the Court, Pretrial Services, or the Probation Office; (e) denies involvement in the offense or provides conflicting statements regarding his involvement or falsely denies or frivolously contests conduct relevant to the offense; (f) attempts to withdraw his guilty plea; (g) commits or attempts to commit any crime; (h) fails to appear in court; or (i) violates the conditions of pretrial release.

Under United States Sentencing Guideline § 3E1.1(b), the United States will move for an additional one-level downward adjustment for acceptance of responsibility before sentencing because the defendant communicated his decision to plead guilty in a timely manner that enabled the United States to avoid preparing for trial and to efficiently allocate its resources.

These Sentencing Guidelines provisions, if applied, will result in a total offense level of 17 (if two-level adjustment applies) or 16 (if the two-level adjustment and additional one-level adjustment both apply).

D.   <u>Criminal History Category</u>.  The defendant acknowledges that the Court may base his sentence in part on the defendant's criminal record or criminal history.  The Court will determine the defendant's Criminal History Category under the Sentencing Guidelines.

E.   <u>Relevant Conduct</u>.  The Court may consider any counts dismissed under this Plea Agreement and all other relevant conduct, whether charged or uncharged, in determining the applicable Sentencing Guidelines range and whether to depart from that range.

F.   <u>Additional Sentencing Information</u>.  The stipulated Sentencing Guidelines calculations are based on information now known to the parties.  The parties may provide additional information to the United States Probation Office and the Court regarding the nature, scope, and extent of the defendant's criminal conduct and any aggravating or mitigating facts or circumstances.

1   Good faith efforts to provide truthful information or to correct factual misstatements shall not be

2   grounds for the defendant to withdraw his guilty plea.

3       The defendant acknowledges that the United States Probation Office may calculate the

4   Sentencing Guidelines differently and may rely on additional information it obtains through its

5   investigation.  The defendant also acknowledges that the Court may rely on this and other additional

6   information as it calculates the Sentencing Guidelines range and makes other sentencing

7   determinations, and the Court's reliance on such information shall not be grounds for the defendant

8   to withdraw his guilty plea.

9   **VII.     APPLICATION OF SENTENCING STATUTES**

10      A.     <u>Maximum Penalty</u>.   The maximum penalty for violating Title 18, United States

11  Code, Section 1349, Conspiracy to Commit Mail Fraud, is a twenty-year prison sentence, a fine of

12  not more than two-hundred fifty thousand dollars ($250,000), or both.

13      B.     <u>Factors Under 18 U.S.C. § 3553</u>.  The Court must consider the factors set forth in 18

14  U.S.C. § 3553(a) in determining the defendant's sentence.  However, the statutory minimum and

15  maximum sentences limit the Court's discretion in determining the defendant's sentence.

16      D.     <u>Parole Abolished</u>.  The defendant acknowledges that his prison sentence cannot be

17  shortened by early release on parole because parole has been abolished.

18      E.     <u>Supervised Release</u>.  In addition to imprisonment and a fine, the defendant will be

19  subject to a term of supervised release not to exceed ~~three years~~ *five (5)*.  Supervised release is a period of

20  time after release from prison during which the defendant will be subject to various restrictions and

21  requirements.  If the defendant violates any condition of supervised release, the Court may order the

22  defendant's return to prison for all or part of the term of supervised release, which could result in the

23  defendant serving a total term of imprisonment greater than the statutory maximum prison sentence.

24

F.    Special Assessment.   The defendant will pay a $100.00 special assessment per count of conviction at the time of sentencing.

## VIII.   RESTITUTION

In exchange for benefits received under this Plea Agreement, including adjustments to the loss amount contained in the Sentencing Guidelines Offense Level Calculations to account for disputed facts, the defendant agrees to make full restitution in an amount not to exceed $3,500,000 to victims of the fraud scheme, to be named in the judgment at the time of sentencing, to be held jointly and severally liable with any codefendants.  18 U.S.C. § 3663(a)(3).  The defendant cannot discharge his restitution obligation through bankruptcy proceedings.  The defendant acknowledges that restitution payments and obligations cannot offset or reduce the amount of any forfeiture judgment imposed in this case.

## IX.    POSITIONS REGARDING SENTENCE

The United States may argue for any sentence within the Sentencing Guidelines range corresponding to the offense level determined by the court unless the defendant commits any act that could result in a loss of the downward adjustment for acceptance of responsibility.  The defendant may request a sentence below the Sentencing Guidelines range determined by the court based upon the factors set out in 18 U.S.C. § 3553 and the United States may oppose it.  Notwithstanding the agreement to recommend a sentence within the Sentencing Guidelines range corresponding to the offense level determined by the court, the United States reserves its right to defend any lawfully imposed sentence on appeal or in any post-conviction litigation.

The defendant acknowledges that the Court does not have to follow this recommendation. The defendant also acknowledges that the Court does not have to grant a downward departure based on the defendant's substantial assistance to the United States, even if the United States chooses to file a motion pursuant to 18 U.S.C. § 3553(e)(1), USSG § 5K1.1, or Fed. R. Crim. P. 35.  This Plea

Agreement does not require the United States to file any pre- or post-sentence downward departure motion under USSG § 5K1.1 or Fed. R. Crim. P. 35. Notwithstanding its agreement to recommend the defendant be sentenced within the Guidelines range calculated in this Plea Agreement, the United States reserves its right to defend any lawfully imposed sentence on appeal or in any post-conviction litigation.

**X.     FORFEITURE**

Notwithstanding adjustments to the loss amount contained in the Sentencing Guidelines Offense Level Calculations to account for disputed facts, the defendant knowingly and voluntarily:

A.     Agrees to the District Court imposing an in personam criminal forfeiture money judgment of $271,282, not to be held jointly and severally liable with any codefendants and the collected money judgment amount between all codefendants is not to exceed $3,300,000;

B.     Waives his right to any abandonment proceedings, any civil administrative forfeiture proceedings, any civil judicial forfeiture proceedings, or any criminal forfeiture proceedings of the in personam criminal forfeiture money judgment (proceedings);

C.     Waives service of process of any and all documents filed in this action or any proceedings concerning the in personam criminal forfeiture money judgment arising from the facts and circumstances of this case;

D.     Agrees not to file any claim, answer, petition, or other documents in any proceedings concerning the in personam criminal forfeiture money judgment;

E.     Waives the statute of limitations, the CAFRA requirements, Fed. R. Crim. P. 7, 11, and 32.2, all constitutional requirements, including, but not limited to, the constitutional due process requirements of any proceedings concerning the in personam criminal forfeiture money judgment;

F.    Waives all constitutional, legal, and equitable defenses to the in personam criminal forfeiture money judgment in any proceedings, including, but not limited to, (1) constitutional or statutory double jeopardy defenses and (2) defenses under the Excessive Fines or Cruel and Unusual Punishments Clauses of the Eighth Amendment to the United States Constitution;

G.    Agrees to the entry of an Order of Forfeiture for the in personam criminal forfeiture money judgment to the United States;

H.    Waives the right to appeal any Order of Forfeiture;

I.    Agrees that the in personam criminal forfeiture money judgment is immediately due and payable and is subject to immediate collection by the United States;

J.    Agrees and understands the in personam criminal forfeiture money judgment shall not be treated as satisfaction of any assessment, fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to the forfeiture;

K.    Acknowledges that the amount of the forfeiture may differ from, and may be significantly greater than or less than, the amount of restitution; and

L.    Agrees to take all steps as requested by the United States to pass clear title of any forfeitable assets which may be used to satisfy the in personam criminal forfeiture money judgment to the United States and to testify truthfully in any judicial forfeiture proceedings. The defendant understands and agrees that the in personam criminal forfeiture money judgment amount represents proceeds and/or facilitating property of illegal conduct and is forfeitable. The defendant acknowledges that failing to cooperate in full in the disclosure of assets constitutes a breach of this Plea Agreement.

## XI.    FINANCIAL INFORMATION AND DISPOSITION OF ASSETS

Before or after sentencing, upon request by the Court, the United States, or the Probation Office, the defendant will provide accurate and complete financial information, submit sworn

statements, and/or give depositions under oath concerning his assets and his ability to pay.  The defendant will surrender assets he obtained directly or indirectly as a result of his crimes, and will release funds and property under his control in order to pay any fine, forfeiture, or restitution ordered by the Court.

## XII.  COOPERATION

1.      The Defendant agrees, if requested by the United States, to provide complete and truthful information and testimony concerning the Defendant's knowledge of all other persons who are committing or have committed offenses against the United States or any state, and agrees to cooperate fully with the United States and any state and local agencies in the investigation and prosecution of such persons.

2.      In the event the United States Attorney decides in the sole discretion of the United States Attorney that the assistance provided by the Defendant amounts to "substantial assistance" pursuant to U.S.S.G. § 5K1.1, the United States will timely file a motion for downward departure from the applicable Guideline and to sentence the Defendant without regard to any mandatory minimum sentence. The Court has the sole discretion to grant such a motion.

3.      The Defendant agrees that a motion for downward departure based on substantial assistance shall not be made under any circumstances unless the Defendant's cooperation is deemed to be substantial assistance by the United States Attorney.  The United States has made no promise, implied or otherwise, that the Defendant will be granted a departure for substantial assistance. Further, no promise has been made that such a motion will be made even if the Defendant complies with the terms of this Plea Agreement in all respects but has been unable to provide substantial assistance as determined in the sole discretion of the United States Attorney.

4.      The United States agrees to consider the totality of the circumstances, including but not limited to, the following factors, in determining whether, in the sole discretion of the United

States Attorney, the Defendant has provided substantial assistance which would merit a motion by the United States for a downward departure from the applicable Guideline:

        a.      The United States' evaluation of the significance and usefulness of the Defendant's assistance;

        b.      The truthfulness, completeness, and reliability of any information or testimony provided by the Defendant;

        c.      The nature and extent of the Defendant's assistance;

        d.      Any injury suffered, or any danger or risk of injury to the Defendant or the Defendant's family resulting from the Defendant's assistance; and

        e.      The timeliness of the Defendant's assistance.

5.     The Defendant agrees that in the event the United States files a downward departure motion based upon the Defendant's substantial assistance, the United States reserves the right to make a specific recommendation to the Court regarding the extent of such a departure. The Defendant understands and agrees that the final decision as to how much of a departure, if any, is warranted rests solely with the Court.

6.     The Defendant agrees that if the United States determines that the Defendant has not provided full and truthful cooperation, or has committed any federal, state or local crime between the date of this agreement and the Defendant's sentencing, or has otherwise violated any provision of this agreement, then (a) the agreement and any of its obligations hereunder may be voided by the United States in its sole discretion, (b) the Defendant may not withdraw the guilty plea, and (c) the Defendant shall be subject to prosecution for all federal criminal offenses of which the United States has knowledge, including but not limited to, perjury and obstruction of justice. Any such prosecution may be based upon any information provided by the Defendant or leads derived therefrom.

7.      The Defendant agrees to submit at the United States' request to any polygraph examination concerning the Defendant's statements to the United States.  The Defendant understands that if any test indicates that the Defendant is being untruthful as to any aspect of the Defendant's statements to the United States, the United States on the basis of the test alone may determine that the Defendant has not provided full and truthful cooperation and treat Defendant and their agreement in accordance with paragraph 6 above.

## XIII.   THE DEFENDANT'S ACKNOWLEDGMENTS AND WAIVERS

A.      <u>Plea Agreement and Decision to Plead Guilty</u>.  The defendant acknowledges that:

1.      He has read this Plea Agreement and understands its terms and conditions;

2.      He has had adequate time to discuss this case, the evidence, and this Plea Agreement with his attorney;

3.      He has discussed the terms of this Plea Agreement with his attorney;

4.      The representations contained in this Plea Agreement are true and correct, including the facts set forth in Section IV; and

5.      He was not under the influence of any alcohol, drug, or medicine that would impair his ability to understand the Agreement when he considered signing this Plea Agreement and when he signed it.

The defendant understands that he alone decides whether to plead guilty or go to trial, and acknowledges that he has decided to enter his guilty plea knowing of the charges brought against him, his possible defenses, and the benefits and possible detriments of proceeding to trial.  The defendant also acknowledges that he decided to plead guilty voluntarily and that no one coerced or threatened her to enter into this Plea Agreement.

B.      <u>Waiver of Appeal and Post-Conviction Proceedings</u>.  The defendant knowingly and expressly waives: (a) the right to appeal any sentence imposed within or below the applicable

Sentencing Guideline range as determined by the Court; (b) the right to appeal the manner in which the Court determined that sentence on the grounds set forth in 18 U.S.C. § 3742; and (c) the right to appeal any other aspect of the conviction or sentence and any order of restitution or forfeiture.

The defendant also knowingly and expressly waives all collateral challenges, including any claims under 28 U.S.C. § 2255, to his conviction, sentence, and the procedure by which the Court adjudicated guilt and imposed sentence, except non-waivable claims of ineffective assistance of counsel.

The defendant reserves only the right to appeal any portion of the sentence that is an upward departure or an upward variance from the Sentencing Guideline range determined by the Court.

The defendant acknowledges that the United States is not obligated or required to preserve any evidence obtained in the investigation of this case.

C. <u>Removal/Deportation Consequences</u>. The Defendant understands and acknowledges that if he is not a United States citizen, then it is highly probable that he will be permanently removed (deported) from the United States as a consequence of pleading guilty under the terms of this Plea Agreement. The Defendant has also been advised if his conviction is for an offense described in 8 U.S.C. § 1101(a)(43), he will be deported and removed from the United States and will not be allowed to return to the United States at any time in the future. The Defendant desires to plead guilty regardless of any immigration consequences that may result from his guilty plea, even if the consequence is automatic removal from the United States with no possibility of returning. The Defendant acknowledges that he has specifically discussed these removal/deportation consequences with his attorney.

///

///

///

XIV.   **ADDITIONAL ACKNOWLEDGMENTS**

This Plea Agreement resulted from an arms-length negotiation in which both parties bargained for and received valuable benefits in exchange for valuable concessions.  It constitutes the entire agreement negotiated and agreed to by the parties.  No promises, agreements or conditions other than those set forth in this agreement have been made or implied by the defendant, the defendant's attorney, or the United States, and no additional promises, agreements or conditions shall have any force or effect unless set forth in writing and signed by all parties or confirmed on the record before the Court.

DANIEL G. BOGDEN,
United States Attorney

DATE 5/31/17

DANIEL J. COWHIG,
KILBY C. MACFADDEN
Assistant United States Attorneys

DATE 5/31/17

FRANK H. COFER III
Counsel for Defendant ROBERT CAPUTO

DATE 5/31/17

ROBERT CAPUTO
Defendant

21